Samuel P. McCUTCHEN, Jr., and Jack E. Eskilson, Appellants,

v.

Francis A. OLIVER, Appellee.

Patent Appeal No. 7425.

United States Court of Customs and Patent Appeals.

Oct. 27, 1966.

William E. Schuyler, Jr., Washington, D. C., Eber J. Hyde, Cleveland, Ohio (Harry C. Page, Cleveland, Ohio, of counsel) for appellants.

Louis A. Kline, Dayton, Ohio (John T. Matlago, Nathan Cass, Hawthorne, Cal., William T. Estabrook, Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

This is an appeal from a decision of the Board of Patent Interferences awarding priority of invention in Interference No. 91,815 to Oliver, the senior party.[1] The two counts in issue originated as claims in a patent[2] to McCutchen, Jr., and Eskilson, the junior party, hereafter McCutchen.

Both parties took testimony in attempting to establish priority. The board, upon consideration of the evidence, held that Oliver had reduced to practice "as early as the end of May 1955" and McCutchen was "accorded July 28, 1955 for reduction to practice." The board also held that "Oliver is entitled to make the claims corresponding to the counts." Appellant argues here that first, Oliver's disclosure does not support the counts and second, Oliver's evidence does not establish a reduction to practice at the end of May 1955. Our disposition of this appeal requires only a consideration of Oliver's disclosure. In this respect we agree with appellant's arguments and the decision of the board therefore must be reversed.

The test to be applied where it is alleged that a disclosure does not support a claim for interference purposes is that which was recently applied in Henderson v. Grable, 339 F.2d 465, 52 CCPA 920. There Judge Martin, speaking for an unanimous court, reaffirmed this court's position, stating as follows:

* * * As Judge Rich stated for this court in Hall v. Taylor, 332 F.2d 844, 51 CCPA 1420, 1424:

We find in the Dreager [In re Draeger et al., 150 F.2d 572, 32 CCPA 1217], opinion what we consider the key to determining whether a disclosure supports a claim for interference purposes * * * viz., does the disclosure teach the gist of the invention defined by the claim?

See also Swain et al. v. Crittendon, 332 F.2d 820, 51 CCPA 1459.

The "gist of the invention" test referred to in the Henderson case is a sound principle of interference law and is the key to determining whether the counts here in issue are supported by the Oliver disclosure. As this court stated in Henderson, supra, 339 F.2d at 470:

Appellee and the board cite numerous cases in support of classic propositions of interference law, such as, clearly expressed limitations may not be disregarded, all recitations are material, equivalency of function may not be considered, and so on. We do not disagree, but a study of those cases shows that they are not apposite to the facts here. * * *

"The gist of the invention," states probably more clearly than other propositions of interference law, that the purpose of an interference is to determine "priority of invention," 35 U.S.C. § 135, 35 U.S.C. § 102(g). There is no right to an interference under the patent laws unless the counts are supported by the specification of the applicant who copies a claim from another's patent. This requires at a minimum that such specification disclose the mutually claimed invention. Unless it does, the inquiry as to priority should come to an end.

## THE INVENTION(S)

The counts in issue are as follows:

1. A magnetic transducer head unit comprising a magnetic head having opposite pole pieces presenting confronting lapped pole tips on opposite sides of a recording/reproducing gap, and a bracket supporting said head and presenting at either end of the head broad reference surfaces lapped co-planar with the pole tip of one of said pole pieces.

2. A multichannel magnetic transducer head unit comprising a series of individual magnetic heads, each of said individual heads comprising opposite pole pieces presenting con-

1. Application serial No. 530,014, filed August 23, 1955, assigned to National Cash Register Co.

2. Patent No. 2,888,522, granted May 26, 1959, on an application filed September 6, 1955, assigned to Clevite Corporation.

fronting lapped pole tips on opposite sides of a recording/reproducing gap, and a bracket supporting said individual heads in side-by-side relation with their respective lapped pole tips coplanar and their recording/reproducing gaps aligned, said bracket presenting at either end of the series of heads broad reference surfaces lapped coplanar with the pole tips at one side of the aligned recording/reproducing gaps.

The statutory requirement of section 112 is that the claims shall particularly point out and distinctly claim "the subject matter which the applicant regards as his invention." Here the claims of the McCutchen patent which were copied by Oliver to become the counts of the present interence are so worded that reference to the specifications of the respective parties becomes necessary to ascertain the meaning of certain language therein. One cannot arrive at an understanding of the present counts as they relate to the subject matter of the interference without something more than the counts themselves.

Admittedly verbal similarities exist between the counts and the respective disclosures of the parties. However, to stop here is to violate the spirit of 35 U.S.C. § 135 which authorizes interferences where two or more parties claim "the same subject matter."

Thus the issue cannot be decided here in the rarified atmosphere of claim semantics. Instead, it must be decided at the down to earth level of what the parties *disclosed* as "the gist" of their respective inventions. Cf. Hansgirg v. Kemmer, 102 F.2d 212, 26 CCPA 937.[3]

While an "unambiguous" count may be interpreted without resort to the specification, the counts here are not of this type. Considering the wording of the counts, particularly the term "reference" surfaces, and the arguments of the parties, it is clear that different meanings are ascribed to that term by the parties when interpreting the count. When resort is had to the specifications, the latent ambiguity in the counts becomes apparent.

For appellee to prevail here, it is necessary to find such similarities of the inventions as to support the conclusion that the parties are asserting inventorship of substantially the same invention. 35 U.S.C. § 135.

There is no dispute that both parties were concerned with the same problem: how to construct an interchangeable multiple transducer head mounting unit which would not cause distorted signals to be read from the tape when the heads were changed. Both parties disclose structures in which one mounting unit could be substituted in precisely the same position as another unit. As background it is clear that prior to the work of either party as it was old in this art to construct a transducer head from two core sections wherein the core sections are separated by a recording/reproducing gap. Also, multiple transducer heads were old in the art.

The "gist" of the inventions disclosed by McCutchen and by Oliver is more readily understood by reference to the drawings from their specifications which show preferred embodiments of their respective inventions.

---

**3.** Therein the court stated, 102 F.2d at 26 CCPA at 940, applied recently in In re Spencer, 273 F.2d 181, 47 CCPA 751:

Where one copies a claim from an inadvertently issued patent it should clearly appear that his application disclosed the invention either expressly or inherently. See McKee v. Noonan, 86 F.2d 986, 24 CCPA Patents, 784; Lindley v. Shepherd, 58 App.D.C. 31, 24 F.2d 606.

OLIVER

*Fig.2*

*Fig.5*

McCUTCHEN, JR.

**FIG.3**

**FIG.4**

Oliver's disclosed invention by reference to Fig. 5 is seen to embody ten core sections which are placed in each of two housings 13. The two housings when joined together, as shown in Fig. 2, form a mounting unit 10. Oliver teaches one to place the core sections in each housing, and then pour an epoxy resin around

the core sections to hold them in position. Thereafter, insofar as it is relevant here, *two* grinding operations are performed on the mounting unit: (1) grind "entire inner surface 28 * * * true and flat;" and (2) grind "back surface 29 of housing 13 * * * to a fixed dimension, parallel to polished inner surface 28." After assembly of two housings in one mounting unit, this unit may be placed into holder 40, Fig. 2, and positioning, as relevant here, is achieved through the cooperation of "the precisely machined back surface 29" against "the likewise precisely machined inner" surface of holder 40 of the tape unit. The specification states:

> * * * this type of construction renders alignment of the head gap with respect to the channels on the magnetic tape a simple procedure inasmuch as the outer surfaces of the metallic housings can be precisely machined parallel with the gaps of the heads, and to the same dimensions.

Now, considering McCutchen's invention, we find in Fig. 3 that a bracket with two frame members, 10 and 30, is disclosed. According to the specification, "The second frame member 30 in the bracket is essentially identical to the above-described frame member 10, except that it is substantially shorter at each end." After inserting the core sections in the frame members, each assembly is lapped. The two frame members are then placed together and a potting material is poured around the core sections. The specification states:

> With the parts secured together in this fashion, it will be apparent from Figs. 3 and 4 that the broad lapped front faces 10a' and 10b' on the frame member 10 are exposed at either end of the head unit and serve as reference surfaces aligned with the recording/reproducing gaps of the individual heads in the unit. This novel structural feature of the present head unit may be used advantageously when mounted as shown in Figs. 3 and 4.
>
> * * *

In actual practices, rather than starting with different sized frame members 10 and 30, it may be preferable to have these frame members identical initially. Then, after the frame and pole piece sub-assemblies have been assembled together, the ends of one of these identical frame members are cut off to leave the front faces on the other frame member exposed at either end, resulting in the head unit shown in Figs. 3 and 4.

Comparing the two inventions as thus disclosed, can it be said that Oliver *discloses the gist of the McCutchen invention?* Our answer is "no." McCutchen, in his solution to the problem, performs fewer operations than Oliver. If the operations disclosed by McCutchen are performed according to the Oliver disclosure the problem remains unsolved. To *complete* his solution to the problem, Oliver must perform additional steps, i. e., the back surface 29 of housing 13 must be ground to a fixed dimension, parallel to the polished inner surface 28.

An examination of the testimony presented supports the foregoing conclusion. Oliver testified that the solution to the problem was found in utilizing two reference surfaces cooperating with the lapped pole tips. Witness Ackley, who "physically made all of the parts that went into the heads" under "Oliver's direction," testified in detail as to the lap finish of the inner and outer surface (utilizing a monochromatic light source and an optical light flat for checking); and the tolerances as to thickness (one-thousandth of an inch) and parallelism (one-tenth of a thousandth) in the finished article. Accuracy in parallelism was preferred over accuracy in thickness and there was no exposed reference surface co-planar with the lapped pole tip surfaces. Testimony offered by McCutchen is in complete accord with the McCutchen disclosure. Thus the parties solved a common problem confronting the art by different approaches resulting in different inventions.

Oliver argues in his brief as follows:
* * * In the McCutchen et al patent * * * the mounting approach chosen is to provide mounting surfaces * * * on the head unit finished coplanar with reference to the coplanar reference surfaces. In the Oliver application * * * the mounting approach chosen is to provide mounting surfaces on the head unit finished parallel with reference to the coplanar reference surfaces. Both McCutchen et al and Oliver abut their thus provided mounting surfaces against a cooperating surface on the tape transport equipment to permit rapid and accurate mounting on the head unit on the head unit on the tape transport equipment. * * *

From the foregoing, it should be evident that both Appellants and Appellee use the same basic solution for solving the mounting problem. That is, both parties provide a coplanar reference surface as a convenient reference of the gap plane, * * *.

In view of the fact that appellee was confronted with the real problems of maintaining dimensional thickness in relation to parallelism, absent in McCutchen's device, we do not agree with the position of appellee that "Appellants and Appellee use the same basic solution for solving the mounting problem."

Since we find the gist of the two inventions to be different, McCutchen's motion, filed September 29, 1961, to dissolve the interference should have been granted for the reason stated therein that "The party Oliver has no right to make the claims forming the counts in issue, and his application contains no support for the claims." In denying this motion, the requirement that the disclosure must teach the "gist" of the invention seems to have been ignored. Instead, there appears to have been a slavish examination of each word of the count in minute detail without considering the over-all meaning of these words as used in the parties' respective specifications. This ignores the basic concept of the *Henderson* case, supra.

McCutchen's motion to dissolve pointed out in pertinent part that:

Oliver forms his head in two halves as many persons previously have done. He puts two similar head valves together on either side of a shim 33, which leaves two flanges 37 protruding out the side of his head. He does not say that these flanges are used for locating precisely the gap of the transducer head(s). Quite the contrary— Oliver states at page 2 (lines 28 to 30) and page 3 (lines 1 to 3) that his "type of construction renders alignment of the head gaps with respect to the channels of the magnetic tape a simple procedure inasmuch as *the outer surfaces of the metallic housings can be precisely machined parallel with the gaps of the heads, and to the same dimensions"*. This is exactly what the patentees' invention eliminates.

* * * * * *

Thus, by Oliver's own words, it is the back 29 and the side 31 of his head which are used to align his head. *The front faces of the flanges 37 are not used in any way to mount the head in its holder.*

The primary examiner, apparently without regard to the "gist" of the respective inventions, referred in his decision on this motion to the literal language of the counts. He stated:

Upon examination of Count 1 nowhere is there seen the limitation that requires the references surfaces to be contacted by a corresponding reference surface forming part of the data handling equipment. Since said limitation is not clearly included in the Count it will therefore not be read into the Count of this interference * * *.

It is further noted that nowhere in Count 1 does it state that the "reference surfaces", *themselves,* are used to align the head, or mount the head. These also are limitations not included in Count 1 and therefore will not be read into said Count.

The wording "reference surfaces" means just that; the wording is not

ambiguous and it will be given its broadest interpretation in relation to its import. It is noted that surface 28 (see Fig. 3) of the Oliver application is used as a reference surface for back surface 29 (see lines 6–9, page 6), which positions the head structure with reference to its holder (see lines 1–5, page 8). In view of the above, it would be natural and logical to identify the surfaces 28, of Oliver, as "reference surfaces."

It is plain from the above that the test of the *Henderson* case, supra, was ignored. To avoid an interference, it appears the primary examiner would require that McCutchen's *claims recite* that the broad reference surfaces *contact* the machine and that these surfaces *align* the head in the machine. We do not agree with this reasoning as the claim to the transducer head unit need not recite how the unit operates nor may the claim be interpreted to define only part of a unit as Oliver *would have us do.*

The board in affirming the examiner also appears to have ignored the test referred to in the *Henderson* case, supra, that the "gist" of the respective inventions must be the same. It accepted the reasoning of the primary examiner and added that the McCutchen claim did not expressly state that the reference surfaces were exposed, ignoring the long established rule of law that Oliver is entitled only to a *reasonable* interpretation of the copied claims.

Oliver argues that the counts do not require that the reference surface coplanar with the lapped pole tips be exposed. McCutchen in his specification discloses no less than eleven times that his reference surfaces are exposed, that they serve as aligning means, and that they *abut* against the machine.

During prosecution, McCutchen, to overcome prior art references, argued:

Applicants' invention lies in the provision of a magnetic transducer head having an "air gap" and a support or bracket for the head which has an *exposed* surface at one side of the head which is *aligned* with the gap.

\* \* \* \* \* \*

In order to facilitate the change of transducer heads in precision equipment of the aforesaid types, applicants have provided heads *having precision aligned transducer gaps, and these gaps are precision aligned with one or more "outrigger" surfaces which lie in the plane of the transducer gap.*

\* \* \* \* \* \*

Rettinger does not show an exposed planar surface aligned with the head gaps, and mounting the head assembly of Rettinger in Saegar's bracket does not supply such an "outrigger" surface. \* \* \*

\* \* \* \* \* \*

Such a feature which is essential to applicants' head and which is claimed in each and every claim is completely missing from Rettinger's head.

Applicants cannot find a single reference surface in the Rettinger head which is co-planar with the plane of the gaps of the head. If there is such a surface will the Examiner please refer to it by reference number if possible, or by some other description.

\* \* \* \* \* \*

Applicants' claims call for the head support to have an *exposed* surface *aligned co-planar* with the transducing gap. The prior art does not show or describe this structual feature. Consequently the claims should be allowed.

The Patent Office removed the rejection based on prior art references and the claims, *in view of McCutchen's arguments,* were allowed. Such arguments relied on by the applicant and accepted by the Patent Office to avoid *prior art* references should be considered in interpreting the claims. Considering the respective inventions and the McCutchen specification and file wrapper, we think the McCutchen co-planar "reference surfaces" are exposed. Oliver does not disclose such "reference surfaces." Since we find this to be a necessary feature of the invention as defined by the counts, the decision of the board is reversed.

Reversed.

RICH, Judge (concurring).

I am in agreement with the ultimate conclusion of Judge Smith's opinion, that the motion to dissolve should have been granted because Oliver cannot make the counts, but I arrived at that conclusion by somewhat different reasoning.

The main problem in this case, as I see it, is what the counts mean; and a secondary problem is how we go about determining what they mean. The key expression is "reference surfaces." The gist of my position is that I consider that expression to be ambiguous and therefore I follow the rule, too well settled to require citation of authority, that under that circumstance we look to the application in which the counts originated in order to determine the meaning of the ambiguous expression.

This question of ambiguity of interference counts has always been a troublesome one. Semantics is involved in its broadest sense: the science dealing with the meanings of words as symbols and with human behavior in reaction to those symbols, including unconscious attitudes and linquistic assumptions. What has happened and what has been said in this interference amply exemplifies these attitudes and assumptions.

The examiner, when confronted with the motion to dissolve and the argument that Oliver does not disclose the invention which the counts define, reacted by saying:

> The wording "reference surfaces" means just that; the wording is not ambiguous and it will be given its broadest interpretation in relation to its import.

I find that statement to be a reaction to symbols full of undisclosed linguistic assumptions. Means just what? What is its "import"? Apparently the examiner had his own ideas on the matter but our difficulty is that he nowhere disclosed them other than in his conclusion that "it would be natural and logical to identify the surfaces 28, of Oliver, as 'reference surfaces'." He did this despite the fact that Oliver did not so designate them, nor did Oliver use any other terms of similar import.

The board, in agreeing with the examiner's dismissal of the motion, pointed out numerous *limitations* which are *not* included in the counts, some of which appear in other McCutchen claims, but this is little help as we are not concerned with missing limitations or with scope in that sense but with the *meaning* of the limitation which *is* there, the limitation to "reference surfaces." In its initial opinion the board says nothing about what its idea of the meaning of "reference surfaces" is. After a request for reconsideration extensively arguing the question of meaning, the board made this somewhat baffling statement:

> The counts do not require reference to the history of the prosecution of the McCutchen et al. patent application file to interpret them. Their meaning is ascertainable without ambiguity from reading the McCutchen et al. specification and claims.

Did the board find it necessary to refer to McCutchen's specification (including the other claims) to find out what "reference surfaces" means or, like the examiner, did it deem that limitation to have a clear meaning standing by itself? Did it follow the rule on count construction?

I have found nothing in the record or briefs to show that standing by itself "reference surfaces" has any definite meaning, or any accepted technical meaning in this art, or that any of the prior art of record uses the term.

I agree generally with Judge Smith's approach when he says:

> * * * the counts of the present interference are so worded that reference to the specifications of the respective parties becomes necessary to ascertain the *meaning* of certain language therein. One cannot arrive at an understanding of the present counts as they relate to the subject matter of the interference without something more than the counts themselves. [My emphasis.]

I read into that statement the thought, necessary to comply with the time-honored rule about interference count interpretation, that the counts are in fact and in law ambiguous, as he suggests in other passages referring to latent ambiguity. The reason I have said above that the problem of ambiguity is a difficult one is that the cases are as full of disagreement on the question of ambiguity as they are on the issue of meaning. It is my view that with a term such as "reference surfaces," which has no definite dictionary definition or accepted meaning in the relevant art, although it may at first glance appear to be a clear expression merely of great breadth, it is always proper to look to the usage of the term by the parties, as they read it on their respective disclosures, in order to determine, first, *whether or not it is ambiguous*. If, on doing this, we find, as I find here, that one party has adopted the term to mean one thing and the other party is using it to mean something else, then, perforce, the term is ambiguous. Once that conclusion has been reached, then we must follow the rule and look to the specification in which it originated and take the meaning there ascribed to it. Following this procedure, what do we find?

From a reading of McCutchen's application, with or without the prosecution thereof, the conclusion is inescapable that he uses the term "reference surfaces"—and with the frequency Judge Smith reports—in the sense of *mounting* surfaces which form an accessible part of the head assembly and *abut* against other surfaces in the device where the head is employed with the effect that the reference surfaces per se align the head, without more. Thus by "reference surfaces" he means aligning surfaces in a functional sense, not merely surfaces *from* which the location of *other* surfaces may be measured or computed by "reference" thereto.

From a reading of Oliver's application we find that he would give an entirely different meaning to the term. He has a surface, as does McCutchen, lying in the plane of the head gaps and forming the face of half of his head *before it is assembled*; but when he gets his head assembled that surface vanishes for all practical or functional purposes, buried in the middle of the head and of no use whatever in mounting the head. It amounts to a mathematical abstraction. He, like the examiner, takes the position it is logical to denote this surface as a "reference surface," presumably for the reason that a back surface 29 of the head, some distance removed from the surface we are speaking of, is carefully located by measurement so as to be parallel to it, the back surface being the one that is used as a "reference surface" to locate the head in its mounting.

At this point I would comment on the supposed common "invention" the parties are said in the principal dissenting opinion to have made. Preliminarily, however, let us consider the supposedly unambiguous word "surface" by itself, which also presumably "means just that." What is its "import"?

It has been made clear that the transducer head is made of two halves, like a peanut butter sandwich. Suppose we spread two slices of bread with peanut butter and then put the slices together. The butter was spread on two surfaces. How many surfaces has the sandwich, 2, 3, or 4? Suppose another laminated structure, a 4-ply auto tire, the plies being vulcanized together. Mounted on the wheel, how many surfaces has it, 1, 2, 5, or 8? Or take a piece of plywood with five laminated sheets of veneer. Has it 2, 6, or 10 surfaces? What did McCutchen mean by "surfaces" and what does Oliver mean, with reference to the finished transducer head defined by the language of the counts? It seems to me that when we are discussing the finished head, assembled from its two halves, we should not be contemplating surfaces which no longer exist, which existed only at one stage in the manufacture, were fugitive and have been obscured, made inaccessible and hence can no longer be used for anything, like the original surfaces of the individual plies

in the tire or the plywood which cannot be *used* for any purpose.

Now the principal dissenting opinion takes the position, which is to me untenable, that

> The "gist" of the invention *defined by the present counts*, as I see it, is simply the provision of surfaces at either end of the recording head which are accurately ground, or lapped, coplanar with the pole tips of one of the pole pieces of the head. That invention is common to both parties. The present counts define that invention clearly.

There are various things wrong with this view. In the first place, the counts refer to the finished head ready for use, not to some phase of its manufacture in which it was in a different condition, as when it was in two unassembled halves. The counts define the sandwich, not the ingredients. Therefore the "head" *of the count*, which has the "surfaces at either end," is the *whole* head, ready to be mounted, not merely the pole-piece portion thereof, as the dissent would have it in order to find the surfaces "at either end * * *." The fact is Oliver's head has no "surfaces at either end of the recording head," "coplanar with the pole tips" when his head is finished. He *had* coplanar surfaces at either end *of the row of pole pieces* before assembly, but they do not appear in the finished head defined in the counts. In McCutchen's head it is otherwise. For the *invention* we must look to the counts, as the dissent emphasizes.

In the second place, we presume, in an interference, that the invention of the counts is a patentable invention, patentable to both parties, and patentability is not open to question. Patentability requires utility. It would therefore seem that the surface, the provision of which is said to be the gist of the invention, must be a surface serving some *useful* purpose in the finished head of the count. In McCutchen's head it does just that. It mates with a positioning surface in the recording/reproducing equipment and locates the gap or line of gaps where it is wanted. The reference surface the dissent finds in Oliver does nothing of the sort. It does nothing. It has become useless. If that be the gist of the invention, I find it difficult to reconcile the view that this now useless surface is a patentable invention with the dissenter's insistence in other notable cases that patentable inventions must have a practical, presently existing utility. See the dissenting opinions in In re Nelson, 280 F.2d 172, 47 CCPA 1031, and in In re Manson, 333 F.2d 234, 52 CCPA 739. One could go further and say that to assume a construction for a patent claim which causes it to read on a structure lacking utility is out of tune with the Supreme Court's decision in Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

· Before leaving the principal dissent, I would point out one other flaw I find in its reasoning. The opinion says:

> It seems to me that the term "reference surfaces" is not ambiguous and that it is plainly applicable to the Oliver structure for the reasons given by the Patent Office. The term "reference surfaces" refers to the surfaces lapped coplanar with the pole tips, whether that term be applied to the McCutchen or Oliver construction. The question of how far that reference surface extends, i. e. whether it extends far enough to be *exposed,* is not placed in issue by the broad language of the counts.

Like the reasoning of the examiner and the board, it confounds the issue of the *meaning* of "reference surfaces" with the question of the absence of *other limitations* from the counts. The conclusion as to what "reference surfaces" refers to is no more than a judicial fiat. The conclusion that the term is not ambiguous is mere assumption not based on an investigation into the facts about its several possible inconsistent meanings.

Ambiguity or the lack of it is not something about which one can make a decision merely by looking at the words, unless we are dealing with terminology which permits only of one definite mean-

ing. "Reference surfaces" is not such a term.

Judge Almond's dissent, like the board's opinion on rehearing, has the fault of looking to McCutchen's application to determine the meaning of the counts while at the same time apparently asserting lack of ambiguity (by joining the principal dissenting opinion which so asserts), an impermissible procedure. I see no more justification, absent ambiguity, for comparing the counts with other McCutchen claims than for studying his specification. That amounts to interpreting the counts as though they were claims in an infringement suit. If that is done, it is clear to me that appellants are right in saying the claims which became the counts would never be held to be infringed by Oliver's structure by reason of the circumstances of their allowance as defining accessible surfaces. That being so, there is no reason for Oliver to be in interference with McCutchen on these claims for if what Oliver discloses is not an infringement of the counts, they do not define a common invention.

To summarize my reasons for voting to reverse: in compliance with the rules in interferences as to count construction I first determine whether the count is ambiguous by looking for its possible meanings and the meanings actually ascribed to it in this case and doing so I find ambiguity; I therefore construe the counts in accordance with the meaning they have in the application where they originated and discover that a "reference surface" is one which is available in the finished transducer head to facilitate its mounting orientation in use; I then determine from reading Oliver's disclosure that he does not have a reference surface, according to that meaning, which complies with the other limitations of the counts since the reference surface he has, which is his back surface 29 (as well as an end reference surface), is not coplanar with the pole tip(s). I conclude, therefore, the Patent Office was in error in its construction of the counts and in failing to grant the

motion to dissolve. I do so only on the basis of the above reasoning.

My conclusions make it unnecessary to consider the issue of priority as I consider that there is no such issue.

WORLEY, Chief Judge (dissenting).

It seem to me that the majority, in construing the present counts, has committed the same error the court found the board to have committed in Henderson v. Grable, 339 F.2d 465, 52 CCPA 920, where the court stated (bracketed material added to correspond to the present factual situation):

We think the board, without determining that the terms * * * [reference surfaces] were ambiguous, erred in construing those terms only with reference to the specific * * * [McCutchen] embodiment rather than examining them to see whether a reasonable interpretation, but one not so broad as to do violence to the language or the concept of the invention, would include the * * * [Oliver] structure.

It is, of course, well settled that the counts of an interference should be given the broadest interpretation which they will reasonably support. Only when the count is ambiguous should resort be had to the patent or application where the counts originated for purposes of interpretation. Apparently, the majority does find the counts ambiguous, stating:

The statutory requirement of section 112 is that the claims shall particularly point out and distinctly claim "the subject matter which the applicant regards as his invention." Here the claims of the McCutchen patent which were copied by Oliver to become the counts of the present interference are so worded that reference to the specifications of the respective parties becomes necessary to ascertain the meaning of certain language therein. One cannot arrive at an understanding of the present counts as they relate to the subject matter of the interference without something more than the counts themselves.

\* \* \* \* \* \*

\* \* \* While an "unambiguous" count may be interpreted without resort to the specification, the counts here are not of this type. Considering the wording of the counts, particularly the term "reference" surfaces, and the arguments of the parties, it is clear that different meanings are ascribed to that term by the parties when interpreting the count. When resort is had to the specifications, the latent ambiguity in the counts becomes apparent.

I find no further explanation of *why* it is thought any given expression in the counts, such as the term "reference surfaces," is ambiguous, or why it is necessary to advert to McCutchen's specification and file wrapper to interpret that expression and to justify the finding that "the McCutchen co-planar reference surfaces are exposed." Indeed, following the rationale proposed by the majority, any *broad* expression capable of covering two different structures becomes *ambiguous,* simply *because* it can be interpreted to read on two different structures.

Both the examiner, in denying McCutchen's motion to dissolve, and the board considered the inner ground surfaces 28 on the frame member of Oliver which has its back surface 29 ground to a fixed dimension parallel thereto to meet the requirements of the counts with respect to "reference surfaces." The examiner stated:

The wording "reference surfaces" means just that; the wording is not ambiguous and it will be given its broadest interpretation in relation to its import. It is noted that surface 28 \* \* \* [the inner ground surface of the frame member which has its back surface ground to a fixed dimension with respect thereto] of the Oliver application is used as a reference surface for back surface 29

\* \* \*, which positions the head structure with reference to its holder \* \* \*. In view of the above, it would be natural and logical to identify the surfaces 28, of Oliver, as "reference surfaces."

The board agreed, stating:

We agree with the Primary Examiner that the counts are supported by the Oliver application disclosure. The counts are very broad. They do not include a mounting element and do not require that the "broad reference surfaces" of the bracket be exposed when the device claimed is assembled. It is noted that the latter requirement appears in McCutchen and Eskilson's patent claims 7 and 9, for example. The limitations that McCutchen et al. seek to have read into the counts for the purpose of avoiding Oliver are of the nature that have been, in certain language, included in other of his patent claims.

I find no error in that position. It seems to me that the term "reference surfaces" is not ambiguous and that it is plainly applicable to the Oliver structure for the reasons given by the Patent Office. The term "reference surfaces" refers to the surfaces lapped coplanar with the pole tips, whether that term be applied to the McCutchen or Oliver construction. The question of how far that reference surface extends, i. e. whether it extends far enough to be *exposed,* is not placed in issue by the broad language of the counts.

McCutchen argues that the gist of the invention of the patent lies in the reference surfaces being exposed, pointing out that the counts define the head as "presenting" the reference surfaces, and cites a definition of "presenting"[1] regarded as demonstrating that the term requires that the surfaces be exposed. However, I am not convinced that there is any sound basis for limiting the counts to a construction where the sur-

---

1. Webster's New International Dictionary, Second Edition, is as follows:

 5. To exhibit or offer to view or notice; as, to present a fine appearance; to bring to anyone's attention or cognizance; as to present a subject; to show; display; set forth; describe.

faces coplanar with the pole tips, defined as "reference surfaces," are exposed when the device is assembled. In that connection, it must be noted that the counts also define the head as "presenting confronting lapped pole tips" on opposing sides of the gap *and that those lapped pole tips are not exposed in the assembled head of McCutchen.* Also, as Oliver has pointed out in oral argument, claim 6 of the McCutchen patent, which defines a complete head unit, refers to "each" of the frame members as "presenting" the lapped surfaces *even though the entire surface* (surface 30a' and 30b') *on one of the members is obscured.* The majority opinion offers no explanation as to why it, in effect, gives the word "presenting" *two different interpretations*—one requiring exposure of the presented surfaces and the other not so requiring—in the same claim.

McCutchen states that Oliver has tried to read the "reference surfaces" of the counts on his disclosure in two other ways in addition to the way that the examiner and board have held it to apply. They advance that contention as a basis for regarding the counts as ambiguous and going to their own disclosure for interpretation. It is true that alternative applications of the term to other elements of the Oliver application were discussed. However, I do not see that as necessarily indicating ambiguity in the term as applied to the surfaces which are coplanar with the pole tips in the frame member of Oliver which has a back surface parallel thereto. *Rather, it seems merely to demonstrate that the language is so very broad as to have elicited a contention it applies to Oliver in more than one way.*

The words of the court in Wirkler v. Perkins, 245 F.2d 502, 44 CCPA 1005,

would seem particularly appropriate here:

We see nothing ambiguous in the term "reference signal computer" nor, it would appear from the record, did anyone in the Patent Office who has dealt with the involved applications. Indeed, it would seem that the only person who is confused is the party Wirkler.[2] *The law is well settled that once an applicant has selected language which is somewhat broad in its scope, he runs the risk that others with specifically different structures may be able to meet the language selected, and he will not be allowed to urge later that the language which he has selected should only be read in the light of his disclosure merely because it originated with him. * * * * (Emphasis supplied).*

The majority states that the issue "must be decided at the down to earth level of what the parties *disclosed* as 'the gist' of their respective inventions," apparently relying on Henderson v. Grable in support of that position. From that sentence, representative of others like it in the opinion, it seems clear that the majority is intent on conducting an interference on the basis of the disclosure of the parties, ignoring the words of the count. It may well be true that Oliver does not disclose the exact form of the invention disclosed in McCutchen's specification. It would be a rare occasion indeed in the mechanical arts that a device of one interference party corresponded to the last detail of the device of the other. In deciding the issue, however, the majority appears to ignore an important requisite of the "test" set forth in *Henderson* and quoted by the majority as the key to determining whether a disclosure supports a claim for interference purposes, viz., does the disclosure [of Oliver here] teach the gist

**2.** It is of more than passing interest to observe that, insofar as the record shows, McCutchen did not contend below that the counts are ambiguous, the examiner stating:

It is first noted that there is no ambiguity claimed by either party as to

the Counts in issue, and it is the Examiner's conclusion that since the Counts are clear and definite, they should and will be given the broadest interpretation which they reasonably will support.

of the invention *defined by the claims* in interference?

I take a different view from the majority as to what is the gist of the invention *defined by the claims*. The majority view apparently is that the invention defined by the claims requires that the reference surfaces mentioned therein must be *exposed*. The present counts do not contain such a limitation. It is well settled that limitations not included in interference counts cannot be subsequently read into them. Jepson v. Egly, 231 F.2d 947, 43 CCPA 853: Rivise and Caesar, Interference Law and Practice, § 60. Thus it seems quite immaterial that, in the words of the majority:

> * * * McCutchen in his specification discloses no less than eleven times that his reference surfaces are exposed, that they serve as aligning means, and that they *abut* against the machine.

The "gist" of the invention *defined by the present counts*, as I see it, is simply the provision of surfaces at either end of the recording head which are accurately ground, or lapped, coplanar with the pole tips of one of the pole pieces of the head. That invention is common to both parties. The present counts define that invention clearly. 35 U.S.C. § 112. In my opinion, the majority is not justified in turning to the McCutchen specification and file wrapper to find a different interpretation of what the invention is.

Even if the McCutchen specification and file wrapper are referred to, they do not support the majority's position. The majority relies heavily on certain arguments advanced by McCutchen during prosecution of his application. After quoting those arguments, the majority states:

> The Patent Office removed the rejection based on prior art references

and the claims, *in view of McCutchen's arguments*, were allowed. Such arguments relied on by the applicant and accepted by the Patent Office to avoid *prior art* references should be considered in interpreting the claims. * * *

In the first place, it does not seem to me that this court is in any *better* position to say why certain claims were allowed to McCutchen than are the examiner and board who denied McCutchen's motion to dissolve and who presumably had the prior art of record in the patent file before them (see Rule 258) in construing the issue. Second, the very arguments quoted by the majority provide ample reason to say that narrower claims in the McCutchen patent, requiring exposed reference surfaces, were allowed because no prior art disclosed exposed reference surfaces; it is equally possible to say that the present claims, making no reference to *exposed* reference surfaces, were allowed because no prior art disclosed reference surfaces [3] lapped coplanar with the pole tips.

In short, it seems to me that the present counts are broad enough to reasonably encompass the different approaches of McCutchen and Oliver to the common problem confronting the art.

I further find no error in the board's determination that Oliver was first to conceive and reduce to practice. I would affirm the decision below in its entirety.

ALMOND, Judge (dissenting).

To the above dissenting opinion, with which I join, I wish to add the following comments. Even assuming arguendo that the counts are ambiguous so that it is necessary to look outside the counts in issue for an interpretation of their scope, important consideration should, in my view, be given to those claims of McCutchen other than those copied by

---

3. As noted by the majority, McCutchen argued:

> Applicants cannot find a single reference surface in the Rettinger head which is co-planar with the plane of the gaps of the head. If there is such a surface will the Examiner please refer to it by reference number if possible, or by some other description.

> Independent examination of Rettinger, which is in the present record, appears to bear out that contention.

Oliver.[1] The McCutchen patent contains ten claims, six claims of which, including the two making up the interference counts, are absolutely silent as to exposed reference surfaces. The four remaining claims all end with the following language:

> * * * the lapped surfaces on said first member projecting substantially beyond the respective ends of the second frame member and defining broad exposed reference faces thereat.

This glaring variation in the scope of the patent claims indicates one thing to me, that the patentees sought coverage on a structure which did not require *exposed* reference surfaces as well as on one that did. At the risk of deciding this case in the "rarified atmosphere" of claim semantics rather than on a "down to earth" basis, it seems to me that where an applicant of his own volition seeks broad patent coverage during prosecution, he should not be permitted at a later date to shrink such coverage in order to avoid a contest of priority on an invention so broadly defined.

I cannot agree with the approach which is to deprecate claim language as mere semantics, and elevate the disclosure to gospel. Such an approach fails to consider the dynamics of patent prosecution. The specification, being written prior to any action by the Patent Office, often emphasizes matter which later proves to be minor or completely lacking in novelty, whereas other matter proves to be of utmost significance to patentability of the invention. The claims on the other hand are subject to amendment in order to meet the strictures of 35 U.S.C. § 112—"particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

It is the patent practitioner's duty to *define* his client's invention in the claims. This may be, and usually is, done by drawing claims of varying scope. Significant evidence, if not the best evidence, of the scope of any one claim is the language employed in other claims. Certainly, the express limitation to "broad exposed reference faces * * *" in those of McCutchen's claims not in issue here is strong evidence that the other claims, forming the counts in issue, do not by implication contain such a limitation. The majority completely disregards this evidence, whereas I view it to be determinative.

I would affirm.

---

[1]. According to Rivise and Caesar, § 56 (1940), it is a fundamental rule of count interpretation that

> It is proper to compare a count with the other claims of the interfering cases in order to find support for a particular interpretation of the count.

See also Rivise and Caesar, § 67 (1940) which fully considers this rule and cites as authority therefor several cases of this court.